IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

LORI TUCKEY,

                              Plaintiff,


         vs.                                    Civil Action No.
                                                3:06-CV-615 (DEP)


COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                              Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

DELAWARE COUNTY                       PORTER L. KIRKWOOD, ESQ.
DEPARTMENT OF SOCIAL SERVICES
111 Main Street
Delhi, New York 13753

FOR DEFENDANT:

HON. GLENN T. SUDDABY                 TOMASINA DiGRIGOLI, ESQ.
United States Attorney                Special Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York  13261-7198

OFFICE OF GENERAL COUNSEL
Social Security Administration
26 Federal Plaza
New York, New York 10278

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## DECISION AND ORDER

Plaintiff Lori Tuckey, who suffers principally from a lumbar and thoracic spinal disorder as well as myofascial pain syndrome, has commenced this proceeding seeking judicial review of the denial of her application for supplemental security income ("SSI") benefits under the Social Security Act. In support of her challenge, plaintiff maintains that the administrative law judge ("ALJ") who heard the matter at the agency level and determined that she is not disabled based his conclusion upon a residual functional capacity ("RFC") finding which fails to garner the support of substantial evidence in the record.  Plaintiff also contends that in arriving at his determination the ALJ improperly rejected opinions of her treating physicians in conflict with the finding of no disability.

Having carefully reviewed the record now before the court, I conclude that the ALJ's finding of no disability resulted from the application of proper legal principles, and is supported by substantial evidence.

I.    BACKGROUND

    A.    General Background

Plaintiff was born on September 14, 1967; at the time of the administrative hearing in this matter, she was thirty-seven years old.

Administrative Transcript at 54, 746.[1]  The plaintiff, who is separated from her

husband, lives with two of her children in an apartment in Sidney, New York.

AT 746, 749.  Ms. Tuckey completed one semester of college, and is certified

as a home health aide.  AT 319, 749.

Plaintiff last worked in January of 2000 as an assistant manager in a

convenience store.  AT 314, 750-51.  Prior to that time, she was employed in

various settings, including as a cashier and home health aide.  AT 314.

B.    Medical Evidence

Ms. Tuckey alleges disability due to a spinal condition and myofascial

pain syndrome.  AT 304.  She claims that her spinal condition first manifested

itself on September 24, 1999 when, while lifting a crate of soda at a

convenience store where she was working at the time, "something snapped"

in her back.  AT 304, 772.  While the plaintiff returned to work on restrictive

duty following the incident, that attempt ultimately proved unsuccessful and,

at the suggestion of her treating medical professionals, she again took leave

from work after only a brief period.  AT 772.  On December 14, 1999, plaintiff

again returned to work on restrictive duty.  *Id.*  After working on that day,

---

[1]        Portions of the administrative transcript filed by the Commissioner and
including proceedings and evidence before the agency, Dkt. No. 3, will be cited as "AT
___."

however, plaintiff was involved in a motor vehicle rollover accident, aggravating her back condition.  AT 772; *see* AT 374, 409, 415.  Ms. Tuckey once again returned to work following the accident, but subsequently stopped working on January 7, 2000.  AT 772-73.

### 1.    Treating Sources

Ms. Tuckey initially saw Michael R. Diaz, D.O., an orthopaedic surgeon, on November 12, 1999, complaining of right-sided low back pain and right leg numbness.  AT 394-95.  Dr. Diaz prescribed physical therapy and medications, and recommended that she not work for two weeks.  *Id.*  Plaintiff subsequently returned to work, but on January 7, 2000, Dr. Diaz recommended that the plaintiff stop working "until further notice."  AT 389.

On February 11, 2000, Dr. Diaz noted that magnetic resonance imaging ("MRI") testing of the plaintiff's lumbar spine showed a right paracentral disc herniation at the T-11 and T-12 area, which he described as "a very rare area for a disc herniation."  AT 388.  Dr. Diaz recommended a "conservative[]" course of treatment, and saw no operative indications.  *Id.*  On March 7, 2000, Dr. Diaz noted that plaintiff reported some improvement in her pain; only three days later, however, Dr. Diaz indicated in an insurance form that the plaintiff was disabled.  AT 383-84.  After following her chronic back pain

-4-

complaints for two years, Dr. Diaz saw the plaintiff for a final time on March 4, 2002, reporting that she "appears to be dealing quite well with her chronic pain."  AT 401.  In his notes of that visit, Dr. Diaz opined that the plaintiff is able to lift up to fifteen pounds, and can sit between thirty to sixty minutes with "frequent ambulation as needed," but noted that she should not perform "excessive" stooping, bending, squatting, climbing, or lifting.  AT 401-02.

Plaintiff received periodic treatment for her condition from Dr. Patrick Germain, a pain management specialist, between January of 2001 to September, 2005.  AT 407-08, 491-590, 683-84, 706-42.  Dr. Germain diagnosed Ms. Tuckey as suffering from myofascial pain syndrome and low back pain radiculopathy, and treated her using a variety of methods including epidural steroid injections, trigger point injections, physical therapy, aqua therapy, medications, and use of a TENS unit.  *Id.*  Dr. Germain's progress notes show that the plaintiff often reported experiencing relief from those treatment regimens.  *See* AT 501, 590.  On September 11, 2003, Dr. Germain noted that the plaintiff was "doing well," that she reported that "her pain has been pretty well under control lately," and that she "is going to start working so I am going to release her to work full time . . . . "  AT 734.

Dr. Germain ordered MRI testing of plaintiff's lumbar spine, which was

performed on November 5, 2003, showing a "significant" disk extrusion to the

right of midline at T11-12, as well as a diffuse desiccation of the lumbar disks

with narrowing, and a small focal annular tear, at L5-S1.  AT 599, 684, 737.

That testing also showed, however, no lumbar disk herniation of significance,

and no canal or foraminal stenosis.  *Id.*  Similarly, an MRI performed on

September 21, 2005 revealed multilevel degenerative disk disease

"throughout the lumbar region," but no disk herniation and no "significant"

facet arthropathy or stenosis.  AT 741-42.

### 2.   Consultative Examiners

In addition to receiving the foregoing treatment for her condition,

Tuckey was examined consultatively on several occasions.  On April 27,

2000, she was examined for insurance purposes by Dr. Joseph L. Quellman.

AT 374-76.  Based on his examination, Dr. Quellman diagnosed the plaintiff

as suffering from an aggravated preexisting low back strain with lumbosacral

degenerative spondylosis.  AT 375.  Dr. Quellman found it "[n]otable" that the

"unremarkable physical findings . . . fail to support or document the claimant's

chronic complaints."  *Id.*  The consultant further opined that the plaintiff is able

to return to work in a "light-duty" capacity, lifting thirty to fifty pounds

occasionally, and twenty pounds frequently, but should avoid any excessive

squatting, bending, or stooping.  AT 376.

Plaintiff was examined by Dr. Ernest R. Levy, a neurosurgeon, on several occasions between January and April of 2001.  AT 396-400.  On February 8, 2001, Dr. Levy opined that plaintiff is disabled with "significant" thoracic back pain, radiating "around to the front."  AT 398.  Dr. Levy noted that he discussed the possibility of performing a transthoracic endoscopic procedure, which plaintiff stated she would consider.  *Id.*  On April 12, 2001, Dr. Levy noted his opinion that the plaintiff was "significantly disabled," adding that she wished to proceed with surgery.[2]  AT 396.

Plaintiff was examined for insurance purposes by Dr. P. Sebastian Thomas on three separate occasions.  AT 473-87, 690-96, 700-03.  On November 6, 2001, based upon his examination, Dr. Thomas diagnosed the plaintiff as suffering from myofascial pain and thoracic disk displacement, and recommended that she continue receiving cortisone injections and massage, and performing stretching exercises, and that she try hydrotherapy and use of a TENS unit.  AT 486.  On August 6, 2002, Dr. Thomas noted that plaintiff's symptoms had increased, but found that she was "not totally disabled."  AT

---

[2]     Dr. Levy's notes provide no illumination as to whether plaintiff underwent surgery.  AT 396-400.  On March 4, 2002, Dr. Diaz noted that plaintiff ultimately decided to undergo no surgery and "will continue with conservative care."  AT 401.

481.  Dr. Thomas once again reevaluated the plaintiff on January 7, 2003,

finding that she suffered from lumbar radiculopathy and myofascial pain

syndrome, and recommending that she undergo vocational rehabilitation to

assess her employment capabilities.  AT 476.

On April 16, 2002, the plaintiff was examined for purposes of her

workers' compensation claim by Dr. Rida Mazagri, a neurosurgeon.  AT 409-

13.  Dr. Mazagri remarked that the plaintiff suffered from low back pain which

was "most likely mechanical in nature."  AT 411.  Dr. Mazagri observed no

evidence of radiculopathy, and discerned no need for surgerical treatment for

the disk at T11-12, "especially as there is no clinical correlation."  *Id.*

Plaintiff was also examined for purposes of her workers' compensation

claim on October 23, 2002 by Dr. Charles R. Reina.  AT 414-23.  Based upon

his examination, Dr. Reina opined that the plaintiff should avoid reaching or

bending below kneel level or reaching overhead; but could lift, carry, or pull

up to fifteen to twenty pounds.  AT 415.  That examiner also found that

plaintiff could sit and stand up to thirty to forty minutes at a time while

alternating positions, leg postures, and support.  *Id.*

On May 14, 2004, at the request of the agency, the plaintiff was

examined by Dr. John Cusick.  AT 609-17.  Following that examination, Dr.

Cusick diagnosed plaintiff as suffering from back pain secondary to arthritis and disk disease, but noted his belief that the plaintiff was "amplifying her symptoms," based on inconsistent test results.  AT 612.  Dr. Cusick opined that notwithstanding her condition, the plaintiff is capable of sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling as a passenger in an automobile, but found that she has a moderate limitation for bending.[3]  *Id.*

## II.   PROCEDURAL HISTORY

### A.    Proceedings Before The Agency

Plaintiff protectively filed an application for SSI benefits on January 1, 2003.  AT 26, 54-58.  That application was denied on March 25, 2003.  AT 28-31.

At plaintiff's request, a hearing was conducted on September 22, 2004 before ALJ Terence Farrell to address plaintiff's claim for benefits.  AT 743-88.  Plaintiff appeared at that hearing, accompanied by a non-attorney representative.  AT 9, 743.

Following the hearing, ALJ Farrell issued a decision dated October 25,

---

[3]     In a medical source statement form, Dr. Cusick similarly indicated that the plaintiff suffers from no exertional, manipulative, visual/communicative, and environmental limitations, AT 614-17, and additionally found that she could frequently perform postural activities.  AT 615.

2004.  AT 12-25.  In his decision ALJ Farrell conducted a *de novo* review of the record, applying the now-familiar, five-step sequential test for determining disability under the Act, finding at step one that plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  AT 16. Proceeding to the next two steps, ALJ Farrell concluded that the evidence supported a finding that plaintiff suffers from lumbar and thoracic spine disorder, and myofascial pain syndrome, regarded by the ALJ as sufficiently severe as to satisfy the relatively modest step two requirement, but further found that the conditions did not meet or equal any of the listed, presumptively disabling conditions set forth in the pertinent regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 19.

After reviewing the medical evidence in the record, including opinions from both treating and examining sources, bearing upon plaintiff's physical limitations, ALJ Farrell next concluded that despite her conditions plaintiff retains the RFC to perform a significant range of sedentary work.  AT 21.  In arriving at the RFC determination, ALJ Farrell rejected plaintiff's claims of disabling pain as not fully credible, particularly in view of plaintiff's daily activities and own stated abilities.  AT 21, 24.

Applying his RFC findings, aided by the testimony of a vocational

expert, ALJ Farrell concluded at step four of the disability algorithm that plaintiff is unable to perform her past relevant work as a retail assistant manager, cashier, and home health aide.  AT 22, 778-79.  After reviewing the medical vocational guidelines (the "grid") set forth in the regulations, 20 C.F.R. Pt. 404, Subpt. P., App. 2, and utilizing the grid as a framework, noting that a conclusion of no disability would be dictated, ALJ Farrell then considered the testimony of the vocational expert, which was elicited to determine whether the limitations imposed by plaintiff's conditions so eroded the range of available jobs indicated by use of the grid as to negate its applicability in plaintiff's case.  AT 22-23.  Based upon a hypothetical question posed to the expert, containing features closely approximating plaintiff's limitations, the ALJ concluded that there are several positions available in the national and regional economies which plaintiff is capable of performing, notwithstanding her limitations, including as a ticket seller, call out operator, food and beverage order clerk, addresser and cutter/paster, and cashier.  AT 23, 779-83.  On that basis, the ALJ concluded that plaintiff was not disabled and thus not entitled to Social Security benefits.  AT 23.

ALJ Farrell's opinion became a final determination of the agency when, on March 17, 2006, the Social Security Administration Appeals Council

denied plaintiff's request for review of that decision.  AT 5-8.

B.   This Action

Plaintiff commenced this action on May 18, 2006.  Dkt. No. 1.  Issue was subsequently joined by the Commissioner's filing on August 30, 2006 of an answer, preceded by his filing on August 21, 2006 of an administrative transcript of the proceedings and evidence before the agency.  Dkt. Nos. 3, 4. With the filing of plaintiff's brief on October 12, 2006, Dkt. No. 6, and a brief on behalf of the Commissioner on November 27, 2006, Dkt. No. 8, this matter is now ripe for determination, and has been referred to me, on consent of the parties, for a final determination pursuant to 28 U.S.C. § 636(c).[4]  Dkt. No. 11.

III.   DISCUSSION

A.   Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002);

---

[4]     This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998, and subsequently amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

*Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. *Martone*, 70 F. Supp. 2d at 148. If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003). To be substantial, there must be "'more than a mere scintilla'" of evidence

scattered throughout the administrative record.  *Id.*; *Martone*, 70 F. Supp. 2d

at 148 (citing *Richardson*).  "To determine on appeal whether an ALJ's

findings are supported by substantial evidence, a reviewing court considers

the whole record, examining the evidence from both sides, because an

analysis of the substantiality of the evidence must also include that which

detracts from its weight."  *Williams*, 859 F.2d at 258 (citing *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have

been applied, and/or that substantial evidence does not support the agency's

determination, the agency's decision should be reversed.  42 U.S.C. § 405(g);

*see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand

the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g),

particularly if deemed necessary to allow the ALJ to develop a full and fair

record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148

(citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand

pursuant to sentence six of section 405(g) is warranted if new,

non-cumulative evidence proffered to the district court should be considered

at the agency level.  *See Lisa v. Sec'y of Dep't of Health and Human Servs.*,

940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is

appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency. *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

B.     Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).   In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists
> in the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§

404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled".  *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work.  *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies

with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

> C.   The Evidence in this Case

In support of her challenge to the agency's determination plaintiff contends that the ALJ's finding of no disability hinges upon an RFC finding which is not support by substantial evidence, and that in arriving at his determination, he failed to consider properly her treating sources' opinions.

> 1.   RFC

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue.  20 C.F.R. § 404.1545(a).  An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis.  *Id.*; *Martone*, 70 F. Supp. 2d at 150.

-17-

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. § 404.1569a. Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered. 20 C.F.R. § 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris,* 728 F.2d at 587). An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations. *Martone*, 70 F. Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-10 (E.D.N.Y. 1997).

Addressing plaintiff's RFC, ALJ Farrell determined that she is capable of performing a significant range of sedentary work,[5] finding specifically as

---

[5]     Sedentary work is defined by regulation as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally

follows:

> [T]he claimant retains the [RFC] to: occasionally lift, carry, push and pull 10 pounds; frequently lift, carry, push and pull less than 10 pounds; stand and walk about 4 hours in a workday, with normal breaks; with standing limited to 30 minutes at a time after which the claimant needs to sit a few minutes before resuming standing; with walking limited to short distances of approximately one block at a time, several times a day; sitting for about 4 hours out of a workday, with normal breaks, with sitting limited to about 30 minutes at a time after which the claimant would have to stand or walk for a few minutes before resuming sitting; and with occasional balancing, climbing, crawling, crouching, stooping, and kneeling.

AT 21.

### a.   Substantial Evidence

In reaching his RFC determination, the ALJ pointed out that the plaintiff's treating physician, Dr. Diaz, opined in March of 2002 that plaintiff should not lift more than fifteen pounds, as well as not excessively stoop, bend, squat, climb, or lift.  AT 20, 401.  Dr. Diaz also recommended that plaintiff avoid sitting more than thirty to sixty minutes at a time, with frequent ambulation as needed.  AT 20, 401-02.

The ALJ also discussed that in April of 2000, examining physician Dr.

---

and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  In addition, sedentary work generally involves periods of standing or walking for a total of two hours in an eight-hour work day, with sitting up to a total of approximately six hours in a similar period.  *See* S.S.R. 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).

Quellman concluded that the plaintiff was capable of returning to work in a "light-duty" capacity, requiring her to lift thirty to fifty pounds occasionally and twenty pounds frequently, and noting further that she should avoid any excessive squatting, bending, or stooping.  AT 20, 376.  Such opinions from consulting sources can provide substantial evidence to support an ALJ's RFC findings.  *See Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) (Sharpe, J.).

In his decision, the ALJ noted that in October of 2002, examining physician Dr. Reina found that the plaintiff should lift, carry, or pull less than fifteen to twenty pounds.  AT 20; *see* AT 415.  Dr. Reina additionally found that plaintiff was limited to sitting and standing up to thirty to forty minutes at a time.  *Id.*  These opinions further buttress the ALJ's findings.

As the ALJ also pointed out, in May of 2004 consultative State agency examiner Dr. Cusick found that the plaintiff was capable of sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling as a passenger in a vehicle.  AT 20-21; *see* AT 612.  "State agency physicians are qualified as experts in the evaluation of medical issues in disability claims.  As such their opinions may constitute substantial evidence if they are consistent with the record as a whole."  *See Leach ex rel. Murray v. Barnhart*,

No. 02 Civ. 3561, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) (citing 20

C.F.R. § 416.927(f); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir.1983)).

Further, the regulations provide, "[A]dministrative law judges *must consider*

findings of State agency medical and psychological consultants or other

program physicians or psychologists as opinion evidence . . . ."  20 C.F.R. §§

404.1527(f)(2)(i), 416.927(f)(2)(i) (emphasis added).

In support of his findings, the ALJ also discussed that in September of

2003, plaintiff's treating physician, Dr. Germain, noted that the plaintiff was

going to start working again, and released her to full-time work.  AT 20; *see*

AT 734.  Moreover, the ALJ noted that examining physician Dr. Thomas had

opined that plaintiff was not totally disabled, and later recommended that

plaintiff undergo vocational rehabilitation to assess her capabilities.  AT 20,

476, 481.

The ALJ's RFC finding is further supported by the results of the

diagnostic testing.  AT 17-19.  As was noted by the ALJ, for example, a

January 2000 MRI of plaintiff's lumbar spine revealed no fracture, destructive

lesion, lumbar stenosis, or disk herniation.  AT 411, 476.  MRI testing of

plaintiff's thoracic spine administered in February of 2000 similarly showed no

neural compromise.  AT 475-76.  The MRI of plaintiff's thoracic spine

performed in November of 2003 showed "no lumbar disk herniation of significance and . . . no canal or foraminal stenosis." AT 599. Further, MRI testing of plaintiff's lumbar spine performed in September of 2005 similarly reflected no disk herniation, significant facet arthropathy, or stenosis.[6]  AT 742.

### b.   Plaintiff's Credibility

In determining plaintiff's RFC, the ALJ addressed plaintiff's credibility and properly found that her allegations were not wholly credible. AT 21, 24. In so finding, the ALJ discussed the relevant factors set forth in the governing regulations.[7] *See* AT 16-21. The ALJ also pointed out that Dr. Quellman found that the "unremarkable physical findings" failed to support or document plaintiff's complaints. AT 17, 375. In addition, he noted, Dr. Cusick found that the plaintiff was "amplifying" her symptoms based on inconsistent test results. AT 20, 612.

---

[6]      That MRI testing was performed after ALJ Farrell rendered his decision, and a report of its results was submitted to the Appeals Council and ultimately made a part of the record. AT 8.

[7]      The regulations provide that if the claimant's testimony concerning the intensity, persistence or functional limitations associated with his or her pain is not fully supported by clinical evidence, then the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

The ALJ further cited plaintiff's own statements as support for the RFC assessment.  AT 21.  At the hearing, Tuckey stated that she was able to lift and carry ten pounds, sit for thirty to forty-five minutes at one time, stand for one hour, and walk two miles.  AT 766.  She also stated that she is able to wash dishes, sweep, mop, fold laundry, hang clothes on a clothesline, cook dinner every night, attend her son's baseball games, and help her children with their homework.  AT 767-72.  Plaintiff estimated that she spends a total of "[p]robably" three hours a day doing housekeeping, dishes, cleaning, and "picking up;" and stated that her hobbies consist of walking for short periods of time.  AT 771-72.  Plaintiff also stated that she has taken her children to an amusement park, and at one point was able to drive "probably" three times a week, but was no longer able to drive because of financial reasons.  AT 770-71.

In light of the foregoing, the ALJ's determination that plaintiff could perform a certain specified range of sedentary work is supported by substantial evidence in the record.[8]

        c.    <u>Need to Alternate Sitting, Standing, and Walking</u>

---

[8]     To the extent that plaintiff argues that she has difficulty walking, Dkt. No. 6 at 12-13, this claim is belied by her testimony that she is able to walk two miles and that her hobbies include taking short walks.  AT 766, 771.

Tuckey also argues that the need to alternate sitting, standing, and walking, as provided in the RFC determination, undermines the ALJ's finding that she is able to perform sedentary work.  For support, plaintiff cites Social Security Ruling ("S.S.R.") 83-12, which pertains to evaluating exertional limitations within a range of work, and provides that "[i]n some disability claims . . . [t]he individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting.  Such an individual is not functionally capable of doing . . . the prolonged sitting contemplated in the definition of sedentary work . . . . "  S.S.R. 83-12, 1983 WL 31253, at *4 (S.S.A. 1983).  The ruling, however, also directs that "[i]n cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the occupational base."  S.S.R. 83-12, 1983 WL 31253, at *4.

The court notes that a more recent ruling, S.S.R. 96-9p, similarly addresses the specific issue now raised, providing in pertinent part that

> [a]n individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded.  The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand . . . .  *It may be especially useful in*

> *these situations to consult a vocational resource in order to*
> *determine whether the individual is able to make an adjustment to*
> *other work.*

S.S.R. 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996) (emphasis

added).

In accordance with these rulings, the ALJ elicited the assistance of a

vocational expert.  *See* AT 776-87.  At the hearing, the expert was asked a

hypothetical question that encompassed plaintiff's specific limitations,

including the ability to sit up to thirty minutes at a time with a need to stand or

walk a few minutes before sitting again, for a total of four hours of sitting.  AT

779-80.  In response, the expert testified that such an individual could

perform numerous jobs in the national and regional economies, including as a

ticket seller, call out operator, food and beverage order clerk, addresser and

cutter/paster, and cashier.  AT 781-83.

It is well established that elicitation of testimony from a vocational

expert is a proper means of fulfilling the agency's burden at step five of the

disability test to establish the existence of jobs in sufficient numbers in the

national and regional economies which a claimant is capable of performing.

*Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986); *Dumas v. Schweiker*,

712 F.2d 1545, 1553-54 (2d Cir. 1983); *Dwyer v. Apfel*, 23 F. Supp.2d 223,

229-30 (N.D.N.Y. 1998) (Hurd, M.J.) (citing *Pratts v. Chater*, 94 F.3d 34, 39

(2d Cir. 1996)); *see also* 20 C.F.R. §§ 404.1566, 416.966.  Use of

hypothetical questions to develop the vocational expert's testimony is also

permitted, provided that the questioning precisely and comprehensively

includes each physical and mental impairment of the claimant accepted as

true by the ALJ.  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777,

779 (6th Cir. 1987).  If the factors set forth in the hypothetical are supported

by substantial evidence, then the vocational expert's testimony may be relied

upon by the ALJ in support of a finding of no disability.  *Id.*

Based upon my finding that the hypothetical question posed by the ALJ

to the vocational expert was supported by substantial evidence, I find that

plaintiff's argument regarding this issue is without merit.

### 2.   Treating Physician

Plaintiff contends that the ALJ erred by "reject[ing]" the opinions

rendered by Dr. Germain, Dr. Diaz, and Dr. Levy.  Defendant counters by

arguing that the ALJ properly evaluated these opinions.

Ordinarily, the opinion of a treating physician is entitled to considerable

deference, provided that it is supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial

evidence.  *Veino*, 312 F.3d at 588;  *Barnett*, 13 F. Supp. 2d at 316.[9]  Such

opinions are not controlling, however, if contrary to other substantial evidence

in the record, including the opinions of other medical experts.  *Halloran v.*

*Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino*, 312 F.3d at 588.  Where

conflicts arise in the form of contradictory medical evidence, their resolution is

properly entrusted to the Commissioner.  *Veino*, 312 F.3d at 588.

In deciding what weight, if any, an ALJ should accord to medical

opinions, he or she may consider a variety of factors including "[t]he duration

of a patient-physician relationship, the reasoning accompanying the opinion,

the opinion's consistency with other evidence, and the physician's

specialization or lack thereof[.]"  *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d

Cir. 1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).

When a treating physician's opinions are repudiated, the ALJ must

_____

[9]     The regulation which governs treating physicians provides:

Generally, we give more weight to opinions from your treating sources . . . If
we find that a treating source's opinion on the issue(s) of the nature and
severity of your impairment(s) is well-supported by medically acceptable
clinical and laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in your case record, we will give it controlling
weight.   When we do not give the treating source's opinion controlling
weight, we apply [various factors] in determining the weight to give the
opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  Failure to apply the appropriate legal standards for

considering a treating physician's opinions is a proper basis for reversal and

remand, as is the failure to provide reasons for rejection of his or her

opinions.  *Johnson*, 817 F.2d at 985-86; *Barnett*, 13 F. Supp. 2d at 316-17.

Addressing the findings of Dr. Germain, the ALJ specifically observed

that Dr. Germain had not expressed an opinion or assessment of the

plaintiff's ability to meet the exertional demands of work-related tasks.  AT 20.

Dr. Germain did note that he was releasing plaintiff to full-time work, a factor

which the ALJ cited in support of the RFC assessment.  AT 20, 21, 734.  It

thus does not appear that the ALJ rejected any opinion rendered by Dr.

Germain.

Turning to Dr. Diaz, another of plaintiff's treating sources, the ALJ

reviewed that physician's medical findings when determining plaintiff's RFC,

specifically citing Dr. Diaz's conclusion that the plaintiff should avoid lifting

more than fifteen pounds, as well as excessive stooping, bending, squatting,

climbing, or lifting.  AT 20, 401.  The ALJ also noted Dr. Diaz's

recommendation that plaintiff avoid sitting more than thirty to sixty minutes at

a time with frequent ambulation as needed.  AT 20, 401-02.  Accordingly,

there is no indication that the ALJ rejected any of Dr. Diaz's specific findings regarding her limitations.  To the extent Tuckey argues that the ALJ should have assigned controlling weight to Dr. Diaz's finding that she was disabled, *see* AT 380, the argument is not well-taken; the ALJ was not bound by that statement since it directly addressed the ultimate issue reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

In his decision, the ALJ makes reference to Dr. Levy, who has also opined that the plaintiff is disabled.  AT 17; *see* AT 398.  It should be noted, however, that the record does not clearly indicate that Dr. Levy was a treating physician.  While the record contains insurance forms suggesting that plaintiff saw Dr. Levy on three occasions, his office notes document only two visits.  *See* AT 374-400.  Accordingly, it is questionable whether such an ongoing treatment relationship has been established as to warrant consideration of that physician as a "treating source."  *See* 20 C.F.R. §§ 404.1502, 416.902.  In any event, the ALJ was not bound by Dr. Levy's naked statement of disability, inasmuch as it directly addressed the ultimate finding reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Snell*, 177 F.3d at 133.

In sum, I am unable to find any opinions rendered by a physician properly regarded as a treating source but rejected by the ALJ, aside from other than statements addressing the ultimate issue of disability.  The ALJ therefore committed no error in this regard, and instead properly assessed the treating physicians' opinions.

IV.    <u>SUMMARY AND ORDER</u>

A review of the record in this case, conducted with the requisite deferential standard as a backdrop, reflects that the ALJ applied the proper legal standards to the evidence in the record, and that his finding of no disability finds sufficient support in the record.  The ALJ properly found that plaintiff could perform a specified range of sedentary work, basing his RFC determination on substantial evidence, and appropriately assessed the opinions of plaintiff's treating sources.  With the RFC finding, applied with guidance from a vocational expert, the ALJ properly concluded that the plaintiff is capable of performing available work within the national and regional economies.

Based on the foregoing, it is hereby

ORDERED that defendant's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability AFFIRMED,

and the plaintiff's complaint in this case be DISMISSED in all respects.

Dated:      September 25, 2007
            Syracuse, NY


David E. Peebles
U.S. Magistrate Judge